PUBLISHED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case Nos.: 2:05po00119 |
| v. ) | 2:05po00120 |
| ) | |
| JUSTIN JONES, ) | |
| Defendant ) | **MEMORANDUM OPINION** |
| ) | |
| ) | By: PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

This case came to be heard before the court on October 19, 2005, at which time the defendant, Justin Jones, ("Jones"), pleaded not guilty to two Violation Notices, each of which charged Jones with a petty offense. *See* 36 C.F.R. § 1.3(a) (2005) (covering offenses within the jurisdiction of the National Park Service). These Violation Notices charged Jones with operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a), and speeding 60 miles per hour in a 45-mile-per-hour zone, in violation of 36 C.F.R. § 4.21, all within the confines of the Cumberland Gap National Historic Park, ("the Park"),[1] on April 29,

---

[1] The Cumberland Gap National Historic Park spans land in the Western District of Virginia, Eastern District of Kentucky and Eastern District of Tennessee. Pursuant to order entered December 28, 1993, in each of these districts, the undersigned, along with magistrate judges in the other districts, have been granted multi-district authority to proceed in matters arising within the confines of the Park.

-1-

2005. At the close of the government's evidence, Jones's counsel made a Motion to Acquit, ("the Motion"), on both charges. The court took the disposition of the offenses and the Motion under advisement. The court has considered the parties' legal arguments and supporting documents, as well as the evidence presented at trial. Based on the reasons stated below, the court grants the Motion in part, finding Jones not guilty on the speeding charge, and denies the Motion in part, finding Jones guilty of operating a motor vehicle while under the influence of alcohol.

*I. Facts*

Late on the evening of April 29, 2005, Brien Chartier, ("Chartier"), a United States Park Ranger at the Park, observed a vehicle, which later was determined to be driven by Jones, driving in a westernly direction on U. S. Route 58 toward the interchange with U. S. Route 25E, within the confines of the Park. Chartier testified that he was parked in a gas station parking lot,[2] located along U. S. Route 58, when he first observed the vehicle. The evidence shows that this gas station is not located within the confines of the Park. Chartier testified that the vehicle drove past him, accelerating at a rapid rate of speed and weaving in traffic,[3] so as to prompt him to ask the park ranger who was accompanying him that evening whether the vehicle was attempting to outdistance them. Chartier testified that he pulled onto the highway and

---

[2]Chartier later testified that he believed that he was in the process of pulling onto U. S. Route 58 from the gas station parking lot when the vehicle drove by.

[3]Jones testified that he did not recall at any time driving 60 miles per hour or weaving in traffic.

-2-

rapidly accelerated in order to follow behind the vehicle.[4]  Chartier testified that he caught up to the vehicle at the base of the entrance ramp onto U. S. Route 25E southbound, located within the boundaries of the Park.  Chartier testified that, at that time, he began pacing the vehicle to determine its speed.  Although Chartier testified that he paced the vehicle at 65 miles per hour[5] in a 45-mile-per-hour zone within the Park's boundaries, he did not testify as to the exact location where this occurred.  Chartier later testified that the boundary of the Park ends just beyond the base of the entrance ramp to U. S. Route 25E southbound, where he began pacing Jones's vehicle.  Chartier testified that he stopped pacing the vehicle and initiated his blue lights in order to make a traffic stop of the vehicle either just under or just past the walkway located above U. S. Route 25E, ("the overpass walkway"), a distance which the evidence presented at trial revealed is approximately one-half mile from the base of the entrance ramp.  The undisputed evidence shows that this is an area not located within the confines of the Park, but in Harrogate, Tennessee.  However, Chartier testified that this was the first safe location to initiate the traffic stop.  The evidence further shows that Jones immediately pulled his vehicle over in response to the blue lights at the entrance to Lincoln Memorial University, ("LMU"), an area also not located within the confines of the Park, but in Harrogate, Tennessee.

---

[4]I note that there is conflicting evidence as to whether Chartier or the other park ranger was driving the patrol car at this time.  Chartier testified that he was driving the vehicle, while Jones testified that it was the other park ranger who exited the patrol car from the driver's side, while Chartier exited from the passenger's side of the patrol car,  when he was eventually stopped.

[5]Although Chartier testified that he paced Jones's vehicle at 65 miles per hour, the Violation Notice charged Jones as traveling 60 miles per hour in a 45-mile-per-hour zone.  Thus, all subsequent references in this Memorandum Opinion to Jones's alleged speed will be to 60 miles per hour.

Case 2:05-po-00120-PMS   Document 15   Filed 12/02/05   Page 3 of 14   Pageid#: 48

After making the traffic stop, Chartier testified that he asked Jones whether he had consumed any alcohol that night, to which Jones replied that he had consumed one beer.[6] Chartier testified that when he asked Jones to step outside of his vehicle to perform field sobriety tests, he noticed a strong odor of alcohol. Chartier testified that he administered three separate field sobriety tests, consisting of the horizontal gaze and nystagmus test, the finger count test and the walk-and-turn test. He further testified that he administered a preliminary breath test, ("PBT"). Chartier testified that Jones failed the lack of smooth pursuit portion of the horizontal gaze and nystagmus test, but passed the nystagmus portion of the test. He further stated that Jones passed the finger count test, but did not pass the walk-and-turn test, noting that he fell off of the imaginary line one time.[7] The results of the PBT showed Jones's breath alcohol content level to be 0.11. Chartier testified that, at that time, just prior to midnight, he arrested Jones for operating a motor vehicle while under the influence of alcohol and transported him to the Middlesboro Police Department, ("MPD"), located in Middlesboro, Kentucky, for the administration of a breath Intoxilyzer test. Chartier testified that an officer with the MPD, administered the Intoxilyzer test. Chartier testified that, even without the PBT results, he would have arrested Jones for driving under the influence, but he stated that the PBT results were part of the evidence he

---

[6] Jones later testified that he had consumed one 12-ounce beer at a bar in Cumberland Gap, Tennessee, approximately 10 minutes before the traffic stop. Jones testified that he was at the bar for only five to 10 minutes. He further testified that, prior to that, he had been at a family-owned restaurant from approximately 3 p.m. or 4 p.m., working and hanging out with friends. Jones stated that he had consumed approximately four beers, several hours before the traffic stop, while at the restaurant. Jones testified that he did not inform Chartier of his consumption of these other beers because he did not think that they had "affected him."

[7] Jones testified that when he later asked Chartier whether he passed the field sobriety tests, Chartier stated that he had, with the exception of the PBT. Chartier testified that he did not recall so informing Jones, but stated that it was possible that he did so.

-4-

used in making his decision to arrest Jones.

The evidence at trial showed that MPD officer, Joshua Harris, ("Harris"), administered the Intoxilyzer 5000 breath test at 12:36 a.m. on April 30, 2005, at the MPD. Harris testified that he is a certified technician of the Intoxilyzer 5000, that he is currently up-to-date on his certification and that he was so certified on April 30, 2005. Harris further testified that the Intoxilyzer 5000 was operating properly at the time he administered the test to Jones. He testified that he began observing Jones at approximately 12:15 a.m. and that the Intoxilyzer test was administered at 12:36 a.m. Harris testified that between 12:15 a.m. and 12:36 a.m., he maintained visual contact of Jones and that Jones consumed no food or drink during this time. The results of this test showed that Jones's breath alcohol content was 0.083 grams per 210 liters of breath, an amount in excess of the legal limit of 0.08 grams per 210 liters of breath.

## *II. Analysis*

As to the speeding charge, Jones argues that the evidence does not prove beyond a reasonable doubt that he was speeding within the confines of the Park. He further argues that the government failed to prove beyond a reasonable doubt that Chartier was in a position to see the speedometer of the patrol car in order to pace him at 60 miles per hour in a 45-mile-per-hour zone. Jones also argues that because the traffic stop for the alleged speeding offense occurred in the state of Tennessee, it was Tennessee law enforcement who had jurisdiction to make the stop, not Chartier. For the following reasons, I find that the government has, in fact, failed to prove this offense beyond a reasonable doubt.

Pursuant to 36 C.F.R. § 4.21(c), which governs speed limits *within national parks*, "[o]perating a vehicle at a speed in excess of the speed limit is prohibited." Thus, according to the very terms of § 4.21(c), it must be proven that Jones was speeding while on Park property. While Chartier testified that he observed Jones accelerating rapidly as he traveled west on U. S. Route 58, located within the Park's boundaries, no evidence was produced as to Jones's speed at that time. Chartier testified that he did not catch up to Jones's vehicle until he reached the base of the entrance ramp to U. S. Route 25E southbound. This is when Chartier began pacing Jones's vehicle. The undisputed evidence shows that the base of the entrance ramp to U. S. Route 25E southbound is, indeed, located within the confines of the Park. Thus, it is clear that Chartier began pacing Jones's vehicle while on Park property. The evidence also is undisputed that Chartier stopped pacing the vehicle and activated his blue lights to initiate the traffic stop either just beneath or just past the walkway overpass, a location not within the confines of the Park, but in the state of Tennessee. The evidence further shows that the distance from the base of the entrance ramp onto U. S. Route 25E southbound to the walkway overpass is approximately one-half mile. What is unclear, however, is the exact location at which Chartier paced Jones's vehicle as traveling 60 miles per hour within a 45-mile-per-hour zone. Although Chartier testified that he did, in fact, pace Jones's vehicle traveling at such a speed on Park property, he did not specify the exact location so that it is not possible to determine beyond a reasonable doubt whether Jones's vehicle was so paced within the confines of the Park. I further note that Chartier himself testified that the Park boundary lies just beyond where he *began* pacing Jones's vehicle and that this commencement of pacing was at the base of the entrance ramp, which Jones testified, and which was not disputed, was believed to have a 15 mile-per-hour speed limit so

-6-

that it is reasonably doubtful that Jones could have been traveling at a high rate of speed while still on Park property. Furthermore, given the short distance between the base of the entrance ramp to U. S. Route 25E southbound and the Park boundary, it is further reasonably doubtful that Chartier could have paced Jones's vehicle at 60 miles per hour in a 45-mile-per-hour zone while located within the Park.

For all of these reasons, I find that the government has failed to meet its burden of proving beyond a reasonable doubt that Jones was speeding 60 miles per hour in a 45-mile-per-hour zone, in violation of 36 C.F.R. § 4.21(c). Thus, I find it unnecessary to address Jones's remaining arguments that Chartier was not in a position to view the speedometer of the patrol car for pacing purposes and that it was Tennessee law enforcement who had jurisdiction to make the stop, not Chartier. For the above-state reasons, I will grant the Motion in part, and find Jones not guilty of the speeding offense, in violation of 36 C.F.R. § 4.21(c).

With regard to the charge of operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a),[8] Jones argues that the arresting officer, a ranger for the Park, lacked the authority to stop and subsequently arrest him on this charge because, although the conduct upon which the charge is based occurred within the officer's presence, the stop and subsequent arrest occurred outside of the Park in the state of Tennessee. According to the United States Code:

---

[8]This regulation states, in relevant part, that "[o]perating or being in actual physical control of a motor vehicle is prohibited while ... [t]he alcohol concentration in the operator's ... breath is 0.08 grams or more of alcohol per ... 210 liters of breath."

-7-

> (b) ... the Secretary of the Interior is authorized to designate ... certain officers or employees of the Department of the Interior who shall maintain law and order and protect persons and property within areas of the National Park System. In the performance of such duties, the officers or employees, so designated, may –
>
> (1) carry firearms and make arrests without warrant for any offense against the United States committed in his presence, or for any felony cognizable under the laws of the United States if he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony, provided such arrests occur within that system or the person to be arrested is fleeing therefrom to avoid arrest ....

16 U.S.C. § 1a-6 (West 2000). Jones argues that because the stop and subsequent arrest for operating a motor vehicle while under the influence of alcohol occurred outside of the Park's boundaries, they were illegal, making the subsequent seizure of evidence also illegal. Thus, Jones argues that any statements made and any evidence gathered during the course of this illegal stop and arrest must be suppressed, including the field sobriety tests, the PBT and the Intoxilyzer 5000 results, thereby precluding their consideration by this court in disposing of the operating a motor vehicle while under the influence of alcohol charge. Therefore, the issue that must be addressed is whether Chartier had the authority to stop and subsequently arrest Jones for operating a motor vehicle while under the influence of alcohol when the conduct upon which the charge is based occurred in his presence, within the boundaries of the Park, but the stop and subsequent arrest occurred outside of the Park. For the following reasons, I find that Chartier did possess such authority.

As previously noted, 16 U.S.C. § 1a-6(b)(1) allows, among other things, a park ranger to make arrests without a warrant for any offense against the United States

-8-

Case 2:05-po-00120-PMS   Document 15   Filed 12/02/05   Page 8 of 14   Pageid#: 53

committed in his presence provided such arrest occurs either within the park system or the person to be arrested is fleeing from that park system to avoid arrest. Here, the evidence is undisputed that Jones was driving through the park system and that Chartier observed Jones driving through the park system just prior to stopping him just outside of the Park's boundaries. Chartier also observed Jones driving at a high rate of speed while on Park property and weaving in traffic. However, it also is undisputed that the actual arrest of Jones did not occur on Park property. Thus, in order for Chartier to have been authorized to arrest Jones for operating a motor vehicle while under the influence of alcohol, Jones must have been fleeing from the park system to avoid arrest within the meaning of the statute.

It is well-settled that statutory interpretation begins with an analysis of the language of the statute. *See In re Coleman*, 426 F.3d 719, 724-25 (4th Cir. 2005) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985)); *see also United States v. Chambers*, 985 F.2d 1263, 1267 (4th Cir. 1993) (citing *Ardestani v. I.N.S.*, 502 U.S. 129 (1991)). In analyzing statutory language, the court must first "determine whether the language at issue has a plain and unambiguous meaning." *Coleman*, 426 F.3d at 725 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). In *Chambers*, the court held that "[e]xcept in 'rare and exceptional circumstances,' statutory language is given its plain meaning as expressed by the ordinary meaning of the words used." 985 F.2d at 1267 (quoting *Ardestani*, 502 U.S. at 135)). Likewise, in *United States v. Maxwell*, 285 F.3d 336, 340 (4th Cir. 2002) (quoting *United States v. Lehman*, 225 F.3d 426, 428 (4th Cir. 2000)), the Fourth Circuit held that unless otherwise defined, words of a statute will be interpreted as taking their "ordinary, contemporary, common meaning."

The "ordinary, contemporary, common meaning" of to "flee" is "to pass away swiftly." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, ("Webster's Third"), 868 (A Merriam-Webster ed., C. & G. Merriam Company 1971); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, ("Webster's Ninth"), 472 (A Merriam-Webster ed., Merriam-Webster, Inc. 1990). In discussing whether an individual is fleeing to avoid arrest within the meaning of 16 U.S.C. § 1a-6(b)(1), in *United States v. Fox*, 147 F. Supp. 2d 1008, 1010 (N.D. Cal., Apr. 27, 2001), the district court did not interpret the statute to require that a defendant lead police on a high speed chase to race them to the park's border. Thus, I find that, given the ordinary and common meaning of "to flee," as well as the only case law that is directly on point, it can be inferred that 16 U.S.C. § 1a-6(b)(1) does not require that a defendant have any knowledge that he or she is being pursued by police and that he or she, as a result thereof, intentionally attempts to evade the police thereafter. Giving the statutory language its plain meaning, I find that it is sufficient that, as here, an individual simply "passes away swiftly" from the park system.

Now that it has been determined that Jones was, indeed, fleeing from the Park, it must be determined whether he did so in order to avoid arrest. The common and ordinary meaning of to "avoid" is "to depart or withdraw from," to "leave" or "to prevent the occurrence of." Webster's Third at 151; Webster's Ninth at 120. "Prevent," in turn, means to "hinder or stop." Webster's Ninth at 933. As above, given the plain meaning of the statutory language, I cannot find that Jones must have known that he was being pursued and, thereafter, intended to hinder or stop the arrest from occurring. Instead, it must merely be shown that he departed or withdrew from the Park, which he clearly did, thereby preventing, whether intentionally or not, the

occurrence of his arrest on Park property.

For these reasons, I find that Jones did, in fact, flee from the Park in order to avoid arrest within the meaning of 16 U.S.C. § 1a-6(b)(1), so that Chartier did possess the authority to stop and subsequently arrest Jones outside of Park property for violations that he observed on Park property. Now I will address whether the government has presented evidence sufficient beyond a reasonable doubt to support a conviction for operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a). For the following reasons, I find that it has.

After Chartier stopped Jones's vehicle, he smelled a strong odor of alcohol on Jones. Thereafter, Jones failed one portion of the horizontal gaze and nystagmus test, he fell off of the imaginary line once during the walk-and-turn test, the results of a PBT test were 0.11,[9] and Jones admitted that he had consumed a 12-ounce beer five to 10 minutes before the stop and in a rather short period of time. I do not find that these facts, without more, would rise to a level sufficient to prove beyond a reasonable doubt that Jones was operating a motor vehicle while under the influence of alcohol. However, given my previous finding that Chartier was statutorily authorized to make the arrest outside of the Park's boundaries, the results of the subsequent Intoxilyzer 5000 test are admissible. The Intoxilyzer 5000 test showed Jones's breath alcohol content to be 0.083 grams per 210 liters of breath, an amount in excess of the legal limit of 0.08 grams of alcohol per 210 liters of breath. That being the case, I find that

---

[9] I note that the evidence presented does not show in relation to how many liters of breath this 0.11 amount was measured. In other words, it was not shown that the PBT results were 0.11 grams of alcohol per 210 liters of breath, as is required by the relevant regulation to show that Jones was operating a motor vehicle while under the influence. *See* 20 C.F.R. § 4.23(a) (2005).

-11-

the evidence in its entirety shows beyond a reasonable doubt that Jones was operating a motor vehicle while under the influence of alcohol.

As an aside, I note that, just as the district court rationalized in *Fox*, 147 F. Supp. 2d at 1010-11, Jones's argument that the stop and arrest were illegal solely because they occurred outside of the Park's boundaries would provide incentive for individuals stopped by park police to try to leave the Park in an effort to avoid arrest. The *Fox* court further noted, and I agree, that this, in turn, could endanger persons and property and could unduly complicate law enforcement by requiring two sets of officers to be involved in the investigation and prosecution of many Park crimes. *See* 147 F. Supp. 2d at 1011. Moreover, it could lead to considerable mischief to law enforcement officers if a Park police officer could not secure immediate cooperation from other law enforcement agencies. *See* 147 F. Supp. 2d at 1011. Here, Jones argues that it is Tennessee law enforcement, not the Park police, who had the authority to stop and arrest him for the alleged offenses of speeding and operating a motor vehicle while under the influence of alcohol. However, Jones offers no argument as to how he has been prejudiced by having been arrested by Park police as opposed to Tennessee law enforcement.

I further note that Jones's argument that Chartier lacked the authority to charge him with operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a), because the conduct forming the basis for the charge occurred outside of the Park boundaries, is nonsensical. While unable to find any case law directly on point, I submit that it is a logical extension of park rangers' authority to conduct investigations off of Park property of offenses committed within the Park

boundaries,[10] that they also have the authority to charge individuals with and arrest individuals for conduct occurring during any such lawful investigation off of Park property. It would be incongruous for park rangers to be vested with the authority to conduct investigations off of Park property for violations that occurred within Park property, while at the same time be unauthorized to charge individuals with offenses or make arrests as a result of information gathered during such lawful investigations. Furthermore, this should hold true even if the offense charged was committed off of Park property, as long as it was committed during the lawful investigation of the events that commenced on Park property. Based on this reasoning, I submit that Chartier was authorized to arrest Jones for driving under the influence based on conduct that occurred during the lawful investigation of offenses allegedly committed within the Park's boundaries and which began on Park property, but moved into the state of Tennessee.

Based on the above-stated reasons, I will grant the Motion in part, finding Jones

---

[10]Title 16 U.S.C. § 1a-6(b)(3) authorizes park police to conduct investigations of offenses against the United States committed in the park system in the absence of investigation thereof by another federal law enforcement agency having investigative jurisdiction over the offense committed or with the concurrence of such other agency. *See Fox*, 147 F. Supp. 2d at 1008 (holding that national park police had jurisdiction to arrest motorist outside of boundaries of park for drunk driving). Likewise, the Ninth Circuit has interpreted 16 U.S.C. § 1a-6(b)(3) to permit investigations that start on federal property to move off federal property. *See United States v. Smith*, 713 F.2d 491, 494 (9th Cir. 1983) (holding that national park police had authority to make a *Terry* stop of defendant immediately off federal property as part of investigation of possible offense committed within park system where no other investigation by federal law enforcement agency); *see also United States v. Darulis*, 1993 WL 264676 (6th Cir. 1993); *United States v. Guillie*, 2002 WL 31640489 (E.D. La. 2002). The court in *Smith* found that there was no reason to believe that Congress intended that park police officers' authority to investigate to be construed so narrowly as to exclude *Terry* stops. *See* 713 F.2d at 494. That being the case, the geographic scope of park officers' investigative authority is not restricted to federal property. *See Smith*, 713 F.2d at 494.

not guilty of speeding 60 miles per hour in a 45-mile-per-hour zone, in violation of 36 C.F.R. § 4.21(c), and I will deny the Motion in part, finding Jones guilty of operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a).

An appropriate order will be entered.

DATED: December 2, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE